# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:14-cr-249-APG-PAL |
| Plaintiff, | |
| | **ORDER DENYING DEFENDANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255** |
| v. | |
| SENG CHEN YONG, | |
| Defendant. | (ECF No. 531, 545) |

Defendant Seng Chen Yong pleaded guilty in December 2014 to acting as an accessory to the unlawful transmission of wagering information. He was sentenced to five years of unsupervised probation, fined, and required to forfeit property and leave the United States and not return for five years.

Yong moves to "vacate, set aside, or correct" the sentence under 28 U.S.C. § 2255, arguing that when the government investigated and prosecuted the case, it committed misconduct sufficient to render his plea involuntary. He also argues that it was unlawful to condition dismissal of charges against his son (Wai Kin Yong) on Yong's plea because the government's case against Wai Kin lacked probable cause. Relatedly, Yong contends that at the plea colloquy the court insufficiently inquired as to whether Yong's plea "was not knowing and voluntary, but instead designed to prevent the government from pursuing its unlawful case against his son."[1]

While the government's conduct in this case was troubling, it did not undermine the voluntariness of Yong's plea. Moreover, the government had probable cause against Wai Kin sufficient to validly condition clemency for him on Yong's plea. And the plea colloquy

---

[1] ECF No. 532 at 3.

adequately probed whether that condition undermined the voluntariness of Yong's plea. Yong's motion is therefore denied.[2]

## I. BACKGROUND

In June of 2014, a group of gamblers from Asia stayed in luxury villas at Caesars Palace Hotel & Casino. Seng Chen Yong ("Yong"), his son Wai Kin Yong ("Wai Kin"), and their friends stayed in Villa 8881. Wei Seng Phua ("Phua"), his son Wai Kit Phua, and their friends stayed in Villa 8882. Hui Tang and his friends stayed in Villa 8888.

Caesars' technical support and security staff noticed that the guests of Villa 8888 had requested the installation of an unusual amount of computer equipment (computers with multiple monitors and desk phones). They suspected the equipment could be used to operate an illegal sports book. Caesars informed the Nevada Gaming Control Board, which informed the FBI, which opened an investigation. The FBI believed that the individuals in all three villas were jointly participating in an illegal betting operation.

FBI agents, together with NGCB agents and a cooperating Caesars IT contractor, disrupted the DSL internet service to Yong and Phua's villas. When the occupants called Caesars for assistance, the agents gained entry into the rooms by masquerading as technical support staff. The agents walked about the private villas while making secret recordings, searching for incriminating evidence.

The agents then filed a warrant application to search Villas 8881, 8882, and 8888 but obscured that they were able to conduct their prior foray into the villas by disrupting the DSL. The agents also created multiple documents designed to give the impression that the internet outages had been fortuitous. Magistrate Judge Koppe granted the warrant on July 9, 2014 and it was executed the same day. Yong was present when agents executed the warrant on Villa 8881, where agents found gambling ledgers containing names, win/loss records, and percentages paid

---

[2] Yong also filed a motion seeking leave to file a response to the government's supplemental brief. ECF No. 545. That motion will be granted.

to the named individuals.[3]  Agents executing the Villa 8882 warrant found Phua, Wai Kit, and Wai Kin watching a soccer game, all sitting in front of laptops with a website displaying live betting odds for the game and instant messaging windows.[4]

Five days later, the government filed a criminal complaint charging eight defendants—including Yong and his son Wai Kin—with federal felonies, including operating an illegal gambling business in violation of 18 U.S.C. § 1955 and violations of the Wire Act, 18 U.S.C. § 1084.[5]  The defendants were arrested and subsequently indicted by a federal grand jury.[6]

In the course of pre-trial discovery, the government produced a tape recording that alerted Yong and the other defendants to the fact that the government had intentionally disrupted the DSL to gain entry into the villas.  On October 28, 2014, the defendants filed a motion to suppress the evidence obtained from the hotel rooms and all fruits thereof,[7] as well as a motion arguing that the government's lies to the magistrate judge tainted the warrant under *Franks v. Delaware*.[8]  The motions argued that the government intentionally disrupted the DSL, concealed that fact from Magistrate Judge Koppe, and made numerous additional intentional or reckless misstatements in the warrant affidavit.

The government responded to the motions in November 2014, conceding that it intentionally disrupted the DSL service.[9]  The government did not fully come clean, though: it refused to hand over any documents describing its scheme until the eve of the evidentiary hearing (which lasted for three days, beginning on December 15, 2014).  At that point, the government delivered to the defendants two documents, both created after the fact.  Even those documents offered only a partial explanation of what the government had done.

---

[3] ECF No. 1 at 8.
[4] *Id.* at 9.
[5] ECF No. 1.
[6] ECF No. 86.
[7] ECF No. 229.
[8] ECF No. 232.
[9] ECF Nos. 259, 260.

After the briefing on the motions was complete, but before the December 15, 2014 evidentiary hearing on the motions, the parties negotiated pleas.  Yong agreed to plead guilty to the misdemeanor of acting as an accessory after the fact to Hui Tang's violations of the Wire Act, as set forth in a Superseding Criminal Information.[10]  The plea agreement explains that it is part of a "group plea," and is conditioned upon each of five defendants pleading guilty, and upon the court accepting those pleas.[11]  It also states that "[i]n exchange for defendant SENG CHEN YONG and [four other defendants] entering their group pleas, the government will move to dismiss the charges pending against Wai Kin Yong."[12]

Yong and the government agreed to recommend a sentence of five years of unsupervised probation and a fine of $100,000.[13]  They further agreed that Yong would depart the country immediately and not return for five years.  Yong also agreed to forfeit his interest in certain property.[14][15]

On December 10, 2014, I conducted a hearing to decide whether to accept Yong's plea.  I explained to Yong that the purpose of the hearing was "to make sure that you understand the consequences of a guilty plea," and "to make sure that you are entering into this plea and this agreement with the government knowingly, voluntarily, and that you are not being forced or coerced into this agreement and into this plea."[16]  I asked several questions to assess whether Yong's plea was intelligent and voluntary.  Near the beginning of the colloquy, I asked Yong, "[h]ave any threats or promises been made to you to get you to waive your right to an

---

[10] ECF No. 340.

[11] *Id.* at 1.

[12] *Id.* at 2.

[13] *Id.* at 11.

[14] *Id.* at 12–18.

[15] The government argues that Yong procedurally defaulted his claims by failing to raise them on direct appeal. ECF No. 536 at 14.  I do not explore this argument at length because I find against Yong on the merits of his claims.  If, however, Yong had succeeded in establishing that his plea was involuntary (on any of the three theories he argued), his failure to appeal would likely be excused.  As Yong points out, if his plea was involuntarily coerced, "the same misconduct that caused him to plead guilty also prevented him from appealing" within the fourteen days following his conviction and sentencing. ECF No. 537 at 13.

[16] ECF No. 392 at 9

indictment?" to which Yong responded "no."[17]  I asked the government to provide its

understanding of the plea agreement, whereupon AUSA Kimberly Frayn clarified, among other

things, that it was a group plea proposal, that Yong was the last defendant to satisfy the group

condition, and that the government would dismiss charges against Wai Kin if the plea went

through.[18]  I again asked Yong if "anyone threatened [him] in order to get [him] to plead guilty,"

or if anyone was "forcing [him] in any way to plead guilty," to which the answer was again

"no."[19]  With respect to Wai Kin, the plea colloquy shows that I was made aware that Wai Kin

was Yong's son at the end of the hearing.[20]

I accepted Yong's plea and entered a judgment of conviction sentencing him to five years

of unsupervised probation.[21]  In May 2015, I granted Phua's motion to suppress the

government's evidence.[22]

## II.  ANALYSIS

A person may attack his sentence under 28 U.S.C. § 2255 if the sentence violated the

Constitution or laws of the United States.  While convictions resting on guilty pleas are immune

to many constitutional attacks, defendants may attack a plea on the ground that it was not

"voluntary and intelligent."[23]  To be constitutionally valid, a guilty plea must be:

> entered by one fully aware of the direct consequences, including the
> actual value of any commitments made to him by the court,
> prosecutor, or his own counsel, . . . unless induced by threats (or
> promises to discontinue improper harassment), misrepresentation
> (including unfulfilled or unfulfillable promises), or perhaps by
> promises that are by their nature improper as having no proper
> relationship to the prosecutor's business (e.g., bribes).[24]

---

[17] *Id.* at 4.
[18] *Id.* at 17.
[19] *Id.* at 26–27.
[20] *Id.* at 40.
[21] ECF No. 373.
[22] ECF No. 515.
[23] *Tollett v. Henderson,* 411 U.S. 258, 267 (1973).
[24] *Brady v. United States*, 397 U.S. 742, 755 (1970).

Yong seeks to vacate his sentence under 28 U.S.C. § 2255, making three arguments as to why his guilty plea was involuntary.[25]

**A.  The government's search-related misconduct does not undermine the voluntariness of Yong's plea.**

Yong argues that the government's Fourth Amendment violations in obtaining much of its evidence, along with the prosecution's ongoing misrepresentations to Yong and this court throughout the pre-plea period, rendered Yong's plea involuntary.  He contends that but for the government's deception, he would have "stayed the course of litigating his suppression motion, and would have prevailed."[26]  The government responds that this is not grounds to overturn a guilty plea for involuntariness, and that a plea can stand independently from evidentiary faults in the government's case.

*Brady* and other Supreme Court precedents offer no relief to a defendant who merely "misjudged the strength of the Government's case."[27]  Indeed, this calculus is endemic to plea bargaining: "[o]ften the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted."[28]  The Constitution "permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor."[29]  The Supreme Court in *Haring v. Prosise* stated that a guilty plea is "a break in the chain of events [that] preceded it in the criminal process,"[30] so a conviction founded on that plea "cannot be affected by an alleged Fourth Amendment violation because the conviction does not rest in any way on evidence that may have been improperly seized."[31]  The Court in *Menna v. New York* echoed that a guilty plea

---

[25] ECF No. 532.
[26] ECF No. 532 at 12.
[27] *Bousley v. United States*, 523 U.S. 614, 619 (1998) (discussing *Brady*)
[28] *Brady*, 397 U.S. at 756.
[29] *United States v. Ruiz*, 536 U.S. 622, 630 (2002) (citations omitted).
[30] 462 U.S. 306, 320 (1983) (internal citations omitted).
[31] *Id.*

constitutes "an admission of factual guilt so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case."[32]   The plea therefore "simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt."[33]

Yong acknowledges this standard, but argues that government deception in assembling its evidence can be so pervasive that it undermines *Brady* voluntariness.  Such an application of *Brady* finds little support in case law—Yong primarily relies on one case from the Fourth Circuit, *United States v. Fisher*.[34]   The majority in *Fisher* acknowledged that the traditionally recognized applications of *Brady* limit qualifying "misrepresentations" to those statements—by the government, the court, or even the defense—that directly go to the terms of the plea: terms like sentence length, parole eligibility, or fine amount.[35]   The court, though, held that *Brady* can be invoked when the government commits "particularly pernicious" antecedent misconduct that distorts the defendant's assessment of the government's case against him.[36]   The *Fisher* dissent and a recent court considering *Fisher* found the departure unsupportable in light of the extensive

---

[32] 423 U.S. 61, 62 n.2 (1975).

[33] *Id.*

[34] 711 F.3d 460 (4th Cir. 2013).  In *Fisher*, a police officer "admitted to having lied in his sworn affidavit that underpinned the search warrant," specifically about the reliability of a confidential informant he used. *Id.* at 462.  The misconduct was not revealed until after the defendant pleaded guilty and the time for appeal had long passed.  The court held that the officer's conduct was a "misrepresentation" under *Brady* that rendered Fisher's plea involuntary: "the officer's affirmative misrepresentation, which informed the defendant's decision to plead guilty and tinged the entire proceeding, rendered the defendant's plea involuntary and violated his due process rights." *Id.*

[35] *See, e.g.*, *Santobello v. New York*, 404 U.S. 257 (1971) (defendant agreed to plea with condition that prosecutor make no sentence recommendation, a promise the prosecutor subsequently broke); *United States v. Hammerman*, 528 F.2d 326, 331–32 (4th Cir. 1975) (prosecutor misrepresented the sentence the defendant would receive, telling the defendant that he would not be sentenced to prison); *Strader v. Garrison*, 611 F.2d 61 (4th Cir.1979) (defendant relied upon gross misinformation from defense counsel as to parole eligibility); *Correale v. United States*, 479 F.2d 944 (1st Cir. 1973) (prosecutor induced plea by offering to make a sentencing recommendation that was legally impossible).

[36] *Fisher*, 711 F.3d at 466 (quoting *Ferrara v. United States*, 456 F.3d 278, 291 (1st Cir. 2013)).

precedent upholding guilty pleas against attacks founded on claims of non-plea-related government misconduct.[37]

Even if I were to adopt *Fisher*'s application of *Brady*, a key difference is that the defendant in *Fisher* did not know about the government's misconduct until long after his conviction and time for appeal had run.  Yong argues that this is a "distinction without a difference" because there was similar deception that caused the defendant to forego a meritorious suppression motion.[38]  Under the logic of *Fisher*, however, this distinction is meaningful.  In *Fisher*, the defendant was completely in the dark about information from which he might have launched an evidentiary challenge.  Here, Yong had discovered from the tape recordings the key facts needed for the suppression motion, and the government had admitted to the essence of its deception in its November 2014 brief.[39]  Yong argues that the government withheld some specifics of the misconduct until after the plea deal, and also that he did not know whether the court would be convinced by the argument for suppression.  But such considerations are common when a defendant chooses whether to raise constitutional defenses to the government's case or instead accept a plea deal.  Though Yong confronted a hard strategic decision, his plea was not in this respect involuntary.

I do not decide whether *Fisher* offers a viable argument for guilty plea involuntariness on that case's facts or some other hypothetical set of facts.  In this case, Yong's awareness of the government's misconduct, though incomplete, equipped him to voluntarily choose between accepting a plea and continuing to defend.  It is true that other factors in *Fisher* are present here,

---

[37] *See Hasbajrami v. United States*, No. 11-CR-623, 2014 WL 4954596, at *3 (E.D.N.Y. Oct. 2, 2014) ("I have not found any Second Circuit decisions citing either *Fisher* or *Ferrara* with approval, nor any other recent Second Circuit case with such an expansive interpretation of the relevant language from *Brady v. United States*.  Indeed, I am not convinced that *Ferrara,* and especially *Fisher,* were correctly decided.")

[38] ECF No. 537 at 8.

[39] In his motion filed five weeks before he pleaded guilty, Yong alleged: "Government agents disconnected the internet access . . . .  Wood went to the villa, presenting himself as a technician working for the hotel. . . .  Wood made a severely misleading cell phone video inside the villa . . . .  Wood conducted a fake conversation on the recording so that anyone who later watched the tape would think the intrusion was legitimate." ECF No. 229 at 11, 22–23.

including "gross police misconduct" that went "to the heart of the prosecution's case." And it is also true that the deception here stretched even farther into the prosecution than it did in *Fisher*. In opposition to the policy concern of finalizing guilty pleas, these factors raise a countervailing problem of abetting police and prosecutorial misconduct. But precedent is clear that defendants must challenge such conduct through evidentiary motions, as Phua did here and Yong was free to do. Of course Yong could not be sure such a motion would be successful, but that is a typical risk of filing motions and foregoing a plea deal.[40]

**B. Yong has not shown the government lacked probable cause to prosecute his son, so Yong's plea was not involuntary despite being conditioned on leniency for his son.**

Yong argues that the government lacked probable cause to prosecute Wai Kin, so it was unlawfully coercive to condition leniency for Wai Kin on Yong joining the group plea. The government responds that the federal grand jury's indictment of Wai Kin established probable cause.

Since threats to prosecute third parties "can carry leverage wholly unrelated to the validity of the underlying charge . . . prosecutors who choose to use that technique must observe a high standard of good faith."[41] In this context, acting in "good faith" means that to use charges against third parties as negotiating leverage, "the government must have probable cause that those third persons committed the crime that the government threatens to charge."[42] "[A]bsent

---

[40] One other case mentioned by neither party here, *Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2013), found *Brady* involuntariness with a guilty plea on a murder charge where the government failed to disclose that a key witness had recanted, and the government manipulated the witness into reverting to his original version of events. *Ferrara* makes a stronger case for extending *Brady* because even though the defendant's plea provided evidence of factual guilt, the government's withholding and manipulation of exculpatory evidence weighed directly against the evidence provided by the plea. When a defendant complains that evidence was obtained by unlawful means and the prosecution failed to disclose that fact (as in *Fisher* and the present case), that does not directly attack the factual reliability of an otherwise valid guilty plea in the same way. Yong alludes fleetingly to suppressed exculpatory evidence, but his allegation is that the government failed to appropriately document the "absence of unusual equipment in the villa." This evidence is nothing like the affirmative evidence pointing to innocence that was present in *Ferrara*, especially because the government's theory here was that the defendants were running an illegal bookmaking operation as a group primarily out of a different villa.
[41] *Harman v. Mohn*, 683 F.2d 834, 837 (4th Cir. 1982).
[42] *United States v Wright*, 43 F.3d 491, 499 (10th Cir. 1994).

probable cause to believe that [Wai Kin] ha[d] committed a crime, offering 'concessions' as to him . . . constitutes a species of fraud" that could render Yong's plea involuntary.[43]

Black's Law Dictionary defines "probable cause" as a "[a] reasonable ground to suspect that a person has committed . . . a crime."[44]  The Supreme Court has described this as an undemanding standard.  "[N]ot a high bar," it requires only a "fair probability" of guilt.[45]  The laxity of the standard explains why grand juries are entrusted with finding probable cause based on hearing only the prosecutor's side.[46]  "The probable cause decision, by its nature, is hard to undermine, and still harder to reverse."[47]  The Ninth Circuit has held that "[i]n a federal prosecution, a grand jury determines whether probable cause exists,"[48] and also that "an indictment establishes probable cause."[49]  But a grand jury's probable cause finding is not dispositive.  Both the Supreme Court and the Ninth Circuit have allowed criminal defendants to attack the validity of a probable cause finding, especially where prosecutorial misconduct is present.[50]  As the petitioner under 28 U.S.C. § 2255, Yong has the burden to show probable cause was lacking.

Yong is correct that in this context, probable cause should be assessed at the time of the plea deal.[51]  But I do not agree with Yong's unsupported suggestion that probable cause dissipates between the time of indictment and the time of the plea deal unless the government uncovers additional evidence.

---

[43] *United States v. Nuckols*, 606 F.2d 566, 569 (5th Cir. 1979).

[44] 10th ed. 2014

[45] *Kaley v. United States*, 134 S. Ct. 1090, 1104, 188 L. Ed. 2d 46 (2014) (internal citations omitted).

[46] *Id.*

[47] *Id.*

[48] *McCarthy v. Mayo*, 827 F.2d 1310, 1316 (9th Cir. 1987)

[49] *United States v. Daras*, 462 F.2d 1361, 1362 (9th Cir. 1972).

[50] *See Hartman v. Moore*, 547 U.S. 250, 252 (2006) (plaintiff alleging malicious prosecution claim must allege lack of probable cause); *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997) (an indictment obtained using false testimony does not establish probable cause for purposes of *Bivens* action).

[51] *See Martin v. Kemp*, 760 F.2d 1244, 1248 (11th Cir. 1985).

The government had multiple pieces of evidence that together provided a "reasonable ground to suspect" that Wai Kin was involved in illegal betting.  Yong complains that no evidence linked the residents of Villas 8881 and 8882 to the alleged unlawful betting activity in Villa 8888, but investigators had a fair amount of circumstantial evidence at least generally connecting the activity of the residents of the three villas.[52]  Yong also argues that there was no specific evidence against Wai Kin.  But the evidence against Wai Kin was similarly specific to other defendants who actually pleaded guilty.  Agents carrying out the search warrant in Villa 8882 (Phua's villa—Wai Kin was staying in 8881) found Phua, Wai Kit, and Wai Kin logged into online sports betting sites with open instant messaging windows, actively tracking live odds for a World Cup game (activity not in and of itself illegal, but consistent with illegal bookmaking).[53]  And further searching of Villas 8881 and 8882 produced extensive ledgers that investigators reasonably believed documented illegal bet "taking," as opposed to just bet "placing."[54]

Had the prosecutor presented false evidence or falsely characterized the evidence, that could be grounds for Yong to challenge the presence of probable cause.[55]  Likewise, if the government had subsequently found evidence exculpating Wai Kin by the time of the plea deal, Yong could well argue that probable cause as to Wai Kin's culpability had eroded.  But Yong does not allege the government fabricated evidence.  And the government asserts that it received no subsequent evidence exculpating Wai Kin, and Yong identifies none.  To require more from the government would indeed "ask[] the government to prove a negative."[56]

---

[52] For instance, Hui Tang, a guest in Villa 8888, told investigators that Yong invited him to Caesar's during this period to play poker, and that Yong "gave him $3 million in credit to gamble." ECF No. 252, Ex. 4.  Investigators' reviews of Caesar's records confirmed this and other transactions, including a $4 million transfer from a bank account owned by Phua to Yong's Caesar's account. Compl. at 13.  An investigating agent stated that, in his experience, these large transfers were consistent with attempts to launder illegal gambling monies. ECF No. 239, Ex. C at 9–11.  All three villas (8881, 8882, and 8888) were booked simultaneously by an individual named Tommy Tong. ECF No. 239, Ex. B at 42.

[53] Compl. at 9.

[54] *Id.* at 8.

[55] As was the case in *Harris*, *supra* note 47.

[56] ECF No. 543 at 5 (government's supplemental briefing on probable cause as to Wai Kin).

Yong notes that the evidence as to Wai Kin's culpability was obtained through unlawful search warrants, and contends that the evidence was too threadbare to properly infer probable cause. The first claim, though true,[57] has not been sufficient to overturn a probable cause finding in any of the cases Yong cites. The fact that evidence is inadmissible at trial does not necessarily vitiate a probable cause finding based on that evidence. And the second claim, that the evidence was insufficient to establish probable cause, begs the question. As just discussed, probable cause "is not a high bar" and is generally the province of the grand jury. The evidence against Wai Kin I laid out above is consistent with what was presented to the grand jury before it returned its indictment. My review of that evidence satisfies me that there is no reason to take the unusual step of overturning the grand jury's finding. Yong presents no proof that the case against Wai Kin had weakened by the time of the plea deal, besides to say "any initial suspicions relating to Wai Kin surely must have dissipated" and that "[i]t beggars belief that the government . . . would simply let a criminal go free."[58] Yong's speculations do not suffice to carry his burden of establishing the absence of probable cause.

Because Yong has not shown that probable cause was lacking as to Wai Kin, it was not unlawfully coercive to condition leniency for Wai Kin on Yong's plea.

**C. Yong has not shown that his plea colloquy was inadequate to establish voluntariness.**

Yong argues that, given the coercive potential of conditioning leniency for Yong's son on Yong pleading guilty, I should have undertaken a more extensive plea colloquy. The government responds that Yong's multiple assurances as to the voluntariness of his plea were sufficient. The government further argues that Yong cannot show that he would have refused to plead guilty but for a more searching plea colloquy. Yong concedes he may not be able to make such a showing, but maintains that the colloquy was nevertheless inadequate to ensure voluntariness.

---

[57] See ECF No. 515 (order granting Phua's motion for suppression).
[58] ECF No. 537 at 4–5.

In group or "package" plea deals, "the trial court should make a more careful examination of the voluntariness of a plea" as "[it might have been] induced by . . . threats or promises."[59]  "[T]his danger of coercion increases when the third party is related to the [defendant]."[60]  The precise concern raised by package pleas is "not so much the intrinsic emotional and psychological pressure, but rather that the co-defendants might be inspired to exert improper influence—threats or promises—on one another."[61]

Yong's theory of emotional "coercion" has been rejected by the Ninth Circuit,[62] and Yong has not pointed to a case where a court overturned a plea for involuntariness under similar facts.  Yong does not argue Wai Kin made "threats or promises" to him, but rather contends that as a "devoted family man,"[63] his commitment to his son caused him to plead guilty where he otherwise would have rejected the plea deal.[64]  But "the desire to help a friend or loved one, and the accompanying psychological and emotional pressure, does not render a guilty plea involuntary.  In sum, [Yong] was faced with a very difficult choice, but the choice was his."[65]

Even if *Zaragoza* is overly dismissive of the threat of emotional coercion, Yong's colloquy adequately explored that concern.  At the beginning of the hearing, I asked Yong, "[h]ave any threats or promises been made to you to get you to waive your right to an indictment?" to which Yong responded "no."[66]  Later in the hearing, AUSA Kimberly Frayn clarified what I already knew, which is that Yong was part of a group plea, and that as part of the plea, the government would also dismiss charges against Wai Kin.[67]  After that exposition, I

---

[59] *United States v. Caro*, 997 F.2d 657, 659–60 (9th Cir. 1993) (quoting *United States v. Castello*, 724 F.2d 813, 815 (9th Cir.1984)).

[60] *Smith v. Sumner*, 843 3 F.2d 502, 1988 WL 26628, at *3 (9th Cir. 1988) (unpublished disposition) (citing *Castello*, 724 F.2d at 815; *Johnson v. Wilson*, 371 F.2d 911 (9th Cir.1967)).

[61] *Zaragoza v. Stainer*, 77 F.3d 491 (9th Cir. 1996) (unpublished opinion).

[62] *Id.*

[63] ECF No. 537 at 5.

[64] *Id.* at 11.

[65] *Zaragoza*, 77 F.3d at 491.

[66] ECF No. 392 at 9.

[67] *Id.* at 17. ("Your Honor, this is a group plea proposal. And I would note that the -- this defendant is the last defendant that would satisfy the group. So, if the Court were to accept this defendant's plea, then the group would be satisfied, and the government would move to dismiss the charges pending against the codefendant Wai Kin Yong.")

again asked Yong if "anyone threatened [him] in order to get [him] to plead guilty," or if anyone was "forcing [him] in any way to plead guilty," to which the answer was again "no."[68]  I was made aware that Wai Kin was Yong's son.[69]  Immediately after Yong's hearing, I conducted a hearing where I granted the government's motion to dismiss charges against Wai Kin.[70]  Both the group nature of the plea and Wai Kin's relationship with Yong were clearly recited in close proximity to Yong's statements that his plea was not coerced.  This satisfies me that the colloquy sufficiently examined the voluntariness of Yong's plea with respect to his son.

**D. Yong has made a sufficient showing on all three issues to warrant a certificate of appealability.**

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."[71]  A certificate of appealability should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."[72]  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."[73]

All three of Yong's claims clear this bar.  Although I did not do so, it would not be unreasonable for a jurist to 1) follow *Fisher*'s reasoning and extend it to this case, 2) find that the government lacked probable cause to prosecute Wai Kin, or 3) find that the plea colloquy insufficiently ensured that Yong's plea was voluntary despite its being exchanged in part for leniency for Yong's son.  I therefore issue a certificate of appealability for all three issues Yong raises.

---

[68] *Id.* at 26–27.
[69] Michael Pancer, Yong's attorney, stated, "I know Mr. Brown is here. He represents my client's son, Your Honor, and he would be addressing the Court if the Court would permit." *Id.* at 40.
[70] ECF No. 393.
[71] Rule 11(a), Rules Governing § 2255 Proceedings.
[72] 28 U.S.C. § 2253(c)(2).
[73] *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

**III.   CONCLUSION**

IT IS THEREFORE ORDERED that Yong's motion to vacate, set aside, or correct his sentence **(ECF No. 531) is DENIED**.

IT IS FURTHER ORDERED that Yong's motion for leave to file a response to the government's supplemental brief **(ECF No. 545) is GRANTED**.

DATED this 3rd day of January, 2017.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE